# CASES

# SUPREME JUDICIAL COURT,

# COUNTY OF CUMBERLAND.

## ARGUED AT APRIL TERM, 1844.

JAMES MAKIN *versus* THE SAVINGS INSTITUTION AT PORTLAND.

An action at law can be maintained by a dispositor of money therein against an incorporated savings institution, after due demand of payment and refusal, to recover the amount of his deposit, where such institution by its laws and regulations, assented to by all the depositors, provided that twice every year a payment of two per cent. interest should be made; "that although four per cent. is promised, yet every fifth year, all the extra income, which has not before been paid out and divided, will then be divided in just proportion to the length of time the money has been in, according to the by-laws;" and that as "people may become sick, or otherwise want their money, after they have put it in; it is provided, that they may take it out, when they please; but the days of taking it out are the third Wednesdays of January, April, July and October;" — although there has been a loss, without fault or neglect on the part of the institution or its officers, of one half of the amount of the funds deposited; and although the by-laws provided that the trustees might, "at any time divide the whole of the property among the depositors in proportion to their respective interests therein," no division in pursuance thereof having been ordered.

Where many persons have, individually, deposited money with such corporation, the relation of partners does not exist between the parties; and the law of partnership is not applicable.

THE plaintiff was a depositor of money with the corporation, and on June 17, 1839, gave the regular notice of his intention to withdraw the same. On July 17, 1839, the plaintiff made a regular demand on the treasurer for the amount

deposited. Payment was refused, and this suit was commenced.

At the trial before SHEPLEY J. at Nov. Term, 1841, the defendants offered to prove, that the whole liabilities of the Institution amounted to $94,703,43 ; that the sum of $5,043,54 had been collected, and dividends to the amount of that sum declared ; that the assets of the institution, after deducting the sum last mentioned, were of the value of $42,231,52 only ; and that the losses, by which the value of the assets had been so reduced, had not arisen from any neglect or fault on the part of the institution or its officers.

The presiding Judge was of opinion that such testimony would not operate in any manner as a defence to this action, and rejected the evidence. Thereupon a verdict was taken for the plaintiff, which was to be set aside, if the testimony should have been admitted, or if the Court should be of opinion that upon the facts the action could not be maintained.

The act of the Commonwealth of Massachusetts, of June 11, 1819, incorporating the defendants, by the name of the "Institution for Savings for the town of Portland and its vicinity," and the by-laws of the institution, were referred to as part of the case.

The case was argued on April 21 and 22, 1842, by

*Preble & Daveis* for the defendants, and by

*Codman & Fox*, for the plaintiff.

WHITMAN C. J. being a relative of one of the depositors, did not hear the argument, or take part in the decision.

The opinion was delayed until 1845, and was then delivered by

SHEPLEY J. — It appears from the report and documents, that during the years 1837 and 1838, Judith Makin deposited with the treasurer of the institution certain sums of money upon the terms and according to the regulations prescribed by it. The plaintiff proved his intermarriage with the person, who made the deposit, and that he had given notice of his intention to withdraw the money ; and that at a subsequent

time, and on one of the days designated for that purpose, he had demanded payment, which was refused.

The defence presented was an inability to pay all the moneys deposited, arising out of losses by which the value of the assets had been reduced fifty per cent. or more, without any neglect or fault on the part of the institution, or of its officers. Whether this can be considered a legal defence, must depend upon the contract between the parties; which is to be ascertained from the charter of the institution, and from its by-laws and regulations prescribed for making deposits.

The third section of the charter contains these words. "The principal of such deposit may be withdrawn at such reasonable times, and in such manner as the said society shall direct and appoint." The fifteenth by-law recognizes the right of the person making the deposit to withdraw it, and prescribes the times and manner of doing it. It contains, among others, these words. "Money deposited shall only be drawn out by the depositor, or by some person by him legally authorized; but no person shall receive any part of the principal or interest without producing the original book, that such payments may be entered therein, unless the trustees shall otherwise determine. No money can be withdrawn except on the third Wednesdays of January, April, July, and October; and one week's notice before the day of withdrawing must be given to the treasurer; and no sum less than ten dollars of the capital of any deposit shall be withdrawn, unless the whole sum deposited by such person shall be less than that amount." The twenty-third by-law states, "the act of making a deposit shall be considered a sufficient assent on the part of the depositors to the by-laws and regulations of the institution." The fourteenth by-law is, "All deposits shall be entered in the books of the corporation, and a duplicate shall be given to each depositor, in which the sum paid by him shall be entered, and which shall be his voucher and the evidence of his property in the institution." The regulations or terms, upon which deposits are to be made, are found in the duplicate book given to the person, who has made the deposit. The following state-

ments are found among the regulations on the fourth and fifth pages of the duplicate book given to Judith Makin. "But people may become sick, or otherwise want their money, after they have put it in. It is provided, that they may take it out, when they please; but the days of taking it out are the third Wednesdays of January, April, July and October; and they must give one week's notice before those days, that they intend to call for their money. The reason of this rule is this. If the money could be called for any day in the year, the trustees could not lend it out, or employ it to the advantage of those, who put it in." "When moneys are called out, this book given to the depositor, must be brought to the office to have the payment entered. Persons may take out the money themselves, or in case of absence or sickness it will be paid to their order, properly witnessed and accompanied by the book."

Among other arguments presented in the defence, the plaintiff was met by one *in limine*, that it was not intended, that a person, who had made a deposit, should be legally entitled to withdraw the money against the will of the institution. And that it had not given an unconditional assent, that it should be withdrawn on certain days at the pleasure of the depositor. This argument is so obviously at variance with the language of the charter, by-laws and regulations, already quoted, that it might be sufficient simply to refer to them. But as it seems to be derived by inference rather from the organization and design of the institution, than from the language alluded to, it may be useful to consider, whether these authorize any such conclusion. And whether such a construction would not be subversive of the design, and destructive of the objects, or some of them, intended to be accomplished. The declared designs as stated in the charter are, to enable the institution to receive "any deposit or deposits of money, and to use and improve the same for the purposes, and according to the directions herein mentioned and provided." And among the directions named in the charter are the following, "and the net income or profit thereof shall be by them applied and divided among persons making the said deposits, their executors, or

administrators, in just proportions, and the principal of such
deposit may be withdrawn at such reasonable times and in
such manner as the said society shall direct and appoint."
Does a proper and legal construction of this language permit
the institution to make by-laws or regulations, which would
prevent a depositor from withdrawing his money at all without
its consent? Or does it only permit the institution to regulate
the time and manner of doing it, leaving in other respects the
decision of the question to the depositor's pleasure, whether
it should or should not be withdrawn? Clearly the latter is
the correct construction, and so the institution appears to have
regarded it, and to have formed its by-laws and regulations
accordingly. "The object of the institution (says the first
by-law) shall be to provide a safe and profitable mode of en-
abling industrious persons of all descriptions to invest such
part of their earnings or property, as they can conveniently
spare, in a manner, which will afford them both profit and
security." And the same in substance is repeated in the reg-
ulations. Nothing is said here respecting the time, during
which it should remain invested; but the institution has itself
declared it to be until "people may become sick, or otherwise
want their money." It is not easy to make language state
more explicitly, than the charter, by-laws and regulations have
stated, the design of the institution to be, to hold out induce-
ments to the improvident and others to deposit something,
which they could then spare, that it might be preserved and
increased, and yet be in a condition to be recalled once in
three months, and applied to administer relief to their necessi-
ties, when sickness or misfortune should come upon them, or
when they should want it for other purposes. And it is not
difficult to perceive, that the charter and the proceedings
under it look to this as the great object to be accomplished.
And to carry out that object and make the deposit available
for such purposes, it is necessary, that it should be liable to be
withdrawn at stated times at the pleasure of the depositor.
And it would not be too much to say, that the object would
be so nearly defeated by a different construction, that few de-

posits could have been expected from the class of persons, who were invited to deposit, if it had been the declared purpose of the institution not to give the depositor a perfect right to withdraw his money at his own pleasure on certain days designated and made known to him. And such a claim on the part of the institution now is in direct conflict with its statement to the depositors, "that they may take it out, when they please."

Another position taken in defence is, that the institution is to be considered as the trustee and the depositors as the *cestui que trusts*, and that the losses therefore fall upon them. That some or all of them must bear the losses, when the institution cannot pay all, is undoubtedly true. And so must those persons, who have claims against any other corporation, which is in a like condition. But that the institution is to be regarded as assuming merely the responsibilities, which attach to a common trustee, who takes the money of the person to be benefitted, and invests it for him, and accounts to him by delivering to him the money, or what remains after deducting losses, or the property, in which it has been invested, with its increase, cannot be admitted. Such a trustee makes no engagement, and none is implied by law, beyond that of acting prudently and faithfully in preserving, investing, and restoring the property, or what may not be lost without his fault. Such a trustee could not present the motives necessary to induce a deposit in a savings institution. Nor carry into effect the purpose of enabling the class of persons intended to be benefitted to have their money placed, where it might be preserved and increased, and yet be returned to them whenever wanted to meet unexpected and necessitous calls. To present the motives and to accomplish the design held out by the institution, it was necessary, that it should assume additional and more onerous and responsible duties, than attach to a common trustee. Accordingly it is found, that the institution had undertaken to act in a different manner; and to assume liabilities of a peculiar character, and suited to carry into effect its special purposes. It proposed to proceed, not upon the well known principles of

a common trust, but upon a system of its own benevolent devising, by which it will receive and invest his money not alone and separate, as in common trusts, but with that of an unlimited number of others; that from all these investments it will obtain an interest, of which no exact part can be decided to belong to any one as accruing from his money; that it will at stated times pay out to him, not even his share of the whole interest earned, but a designated portion, only reserving, it may be, a residue; that it will pay him four per cent. or at that rate without any condition annexed, whether it has or has not earned it; that it will pay out not what may be found to belong to him upon an adjustment of profit and loss, but the sum deposited; and that it will not account with him by a delivery of the property in which his money may have been invested, but will pay it out as provided in the fifteenth by-law, which states, that "all moneys received by the treasurer shall be specie or such bills as are received on deposit at the Portland banks, and all payments shall be made by him in the same manner." It proposed to reserve the increase of interest, if any, over four per cent.; and this might operate as a compensation to the continuing depositors for any injury, which such a course might bring upon them. This was to be divided among those, who for five years might have been subjected to this process of paying out to one not precisely his own money or property, or its increase, but a certain interest and the full amount of his deposit in cash from the common fund of the institution. To this course the institution has pledged itself by its charter, by-laws and regulations, and all the depositors have pledged themselves by the very act of making the deposit. And all the depositors in effect agree, that one, who pleases to call for his money may receive it in full and in cash; and that they will look to the remaining funds for their rights. In all these particulars the rights and duties of the depositors and of the institution are different from those of common trustees and *cestui que trust*. And well might it be said on a former occasion, that it assumed other and greater duties and liabilities, than those properly ap-

pertaining to a trustee. And it would seem, that their obvious character might have operated as an excuse for omitting to set them forth at large. And the corporation having assured, and repeated the assurance, as has been seen, that the depositors might take out their money on certain days, when they pleased, without annexing any condition, or requiring any adjustment of accounts, or losses and gains, it might be said with perfect accuracy, that it did in effect assume the whole risk of losses, for it undertook at all events to pay a stipulated interest, and to repay the principal sum. But it is said by one of the counsel, that this cannot be correct, for the seventh by-law provides, that "the trustees of this institution shall receive no emolument therefrom, and while engaged to a conscientious and upright discharge of their duties, they are not to be held responsible for any losses, which may happen from any cause whatever, except their wilful and corrupt misconduct." The error lies in considering the trustees as personally assuming to perform the engagements of the institution. While this argument as presented by the other counsel is, that the by-law is applicable to the corporation itself, excusing it from the risk of losses. And that by "some confusion of ideas" the trustees were named, when the corporation was intended. The by-law however is neither of doubtful meaning nor obscure. The design was not to provide a protection for the corporation against losses, which it did not seek, except in one event to be hereafter noticed. But it was to protect the persons, who might be trustees from being called upon to make up losses, as is clearly shown by the following provision in that by-law; that "those trustees only, who may be concerned in such misconduct shall be answerable for the same."

It was also asserted in argument, that the funds of the institution were to be considered as a partnership fund. And it was proposed to apply the law applicable to partnership property to regulate the rights of all interested. But the doctrines of that law can have no proper application to this case. There is no union of interests or of rights between the plaintiff and the corporation. On the contrary, they are separate and

distinct. They depend upon mutual stipulations, but the share of them undertaken by each is different. And if the several depositors can in any other sense, than as interested in the same fund, be considered as partners, they have consented by the act of making their deposits, as before noticed, that each may, according to the regulations, withdraw his money. And have done this without any limitation or condition, that there should first be an adjustment of profit and loss. To have waited for such an adjustment in each case before payment would have been so vexatious and impracticable, as to be destructive of all the benevolent purposes of the institution. The results promised from the ordinary action of the institution, as declared in the by-laws and regulations made by it and assented to by all the depositors, may at the expense of a repetition, be stated in the very language of the institution ; and thus stated they are ; that "twice every year, namely, on the third Wednesdays of July and January, a dividend or payment of interest of two per cent. or two dollars on a hundred will be made ;" that "although four per cent. is promised yearly, yet every fifth year all the extra income, which has not before been paid out and divided, will then be divided in just proportion to the length of time the money has been in according to the by-laws ;" that "people may become sick, or otherwise want their money, after they have put it in ; — it is provided, that they may take it out, when they please ; but the days of taking it out are the third Wednesdays of January, April, July and October." These are engagements, among others, which the institution has entered into with its depositors, and they are not accompanied by any condition or limitation, or made to depend on any contingency, so far as it relates to its ordinary action. And without their being carried into effect the design of the institution could not be accomplished. It would be defeated. If the institution by its regulations and offers has undertaken more, than it finds itself able to accomplish, it is only in a position, which is often the result of human arrangements. No blame necessarily attaches to it, or to those by whom its affairs have been managed. It could

not be expected to have provided against losses, which might have fallen upon the most wise and prudent. And it may well be excused, if it has been seduced by a desire to benefit the improvident to propose to confer a greater benefit, than it was able to do, under the state of things, which has happened. All this, however, can afford no legal protection against the performance of all, which it has undertaken to perform. If it cannot pay all, it must do what it can to fulfil its engagements, and pay in conformity to the requisitions of the laws, which govern other corporations and persons. And it cannot justly complain, if the course may be the same as in many, if not most other cases under our laws, that its effects are distributed unequally. Especially as it reserved to itself the power to provide for such an extraordinary contingency as has happened in a manner, that might have secured an equal distribution. This is done by the twenty-second by-law, which says, "the trustees may by a vote of the major part of the whole number, at any time divide the whole of the property among the depositors in proportion to their respective interests therein, upon giving three months notice thereof; and shall also for the like purpose be at liberty to refuse to receive any deposit at their pleasure." This appears to be the only provision made to change the ordinary action of the institution into an extraordinary one. And until the institution has acted under it, the rules and responsibilities of its ordinary action are binding upon it. The institution in the year 1838 declined to receive any more deposits, and authorized the treasurer to pay to any depositor the full amount of his deposit "in any of the bank stock held by the institution at the cost." And it afterward, in consequence of losses, voted, that the by-laws requiring semi-annual dividends be suspended. But it has never proceeded to divide the whole of the property among the depositors according to their respective interests therein. If the trustees, before the commencement of this suit, had determined by a regular vote, under that provision of the by-laws, to divide the whole property, an equal distribution might have been secured by the common consent of all the depositors,

expressed by their assent to the by-laws. And all the deposit-ors having consented, that each on the days named should withdraw his deposit at pleasure to be paid out in cash, they can have no just cause to complain that their interests are limited to the residuum, unless they should think, that the insti-tution unnecessarily neglected to interpose under the twenty-second by-law to prevent its being governed by the regulations for its ordinary action ; and to place it under regulations better suited to its present condition. The legal rights of the parties now before the Court can only be considered ; and there is no legal defence presented.